**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| SHUNTA DAUGHERTY, individually, and )<br>as the administrator of the estate of )<br>MICHAEL DASHAWN MOORE, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>HAROLD HURST, in his individual )<br>capacity; and CITY OF MOBILE, )<br> )<br>Defendants. ) | **CASE NO. 1:17-cv-00072-TM-C** |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant Harold Hurst submits this brief in support of his contemporaneously filed Motion for Summary Judgment.

**INTRODUCTION**

Plaintiff's decedent, Michael Moore ("Moore"), died after an encounter with City of Mobile Police Officer Harry Hurst on June 13, 2016.  As a result, Plaintiff asserts a federal §1983 claim for violation of Moore's Fourth Amendment rights to be free from unreasonable seizure (Count One) and state law claims for wrongful death (Count Two) and negligence (Count Three) against Officer Hurst in this action.  *See* First Amended Complaint (Doc. 74).  The facts relating to this encounter are set out in further detail below.

Defendant Hurst respectfully submits that, for the reasons set forth below, the motion for summary judgment filed contemporaneously with this brief is due to be granted in his favor and against Plaintiff as to all counts asserted against this Defendant.

I.     **NARRATIVE SUMMARY OF FACTS**

   A.  **The Parties**

   1.     Plaintiff, Shunta Daugherty, Michael Moore's mother, brings this lawsuit as the personal representative of the Estate of Michael Moore.  (First Amended Complaint).  She is the mother of Michael Moore.  (First Amended Complaint).

   2.     Defendant Harry Hurst (incorrectly referred to in the Complaint, as last amended, as "Harold Hurst"), was at all material times a police officer with the City of Mobile Police Department ("MPD").

   3.     Defendant City of Mobile ("the City") employed Defendant Hurst within the City's police department at the time of the events made the basis of this lawsuit.

   B.  **The Facts**

   On June 13, 2016, plaintiff's decedent, Michael Moore, and two acquaintances, Mark Amos and Robert Blackmon, were riding around the streets of Mobile in a white Lexus. (**Exhibit 1**, Deposition of Robert Blackmon (and Exhibits 120-122 thereto) ("Blackmon Dep."), at p. 22, l. 5 to p. 23, l. 23; **Exhibit 2**, Deposition Mark Amos (and Exhibit 107 thereto) ("Amos Dep."), at p. 139, ll. 15-19).  Amos was in the front passenger seat and Blackmon was in the back.  (Ex. 1, Blackmon Dep., p. 30, ll. 8-13; p. 163, ll. 15-18; Ex. 2, Amos Dep., p. 118, ll. 4-10).  Moore had claimed to Blackmon that the Lexus belonged to his girlfriend.  (Ex. 1, Blackmon Dep, p. 27, ll. 4-17).

   Blackmon had known Moore to carry a gun for "protection" and, when Blackmon got in the Lexus that day, he saw a gun wedged between Moore's seat and the center console.  (Ex. 1, Blackmon Dep., at p. 29, ln. 16 to p. 30, ln. 7; p. 166, lines 10-18).  Later, as they were riding around, Moore put the gun on his waist.  *Id.*, p. 31, ll. 3-11.

In June 2016, Officer Hurst was employed by the City of Mobile as an MPD patrol officer working the night shift in the MPD's Third Precinct.  (Affidavit of Harold Hurst ("Hurst Aff.") (**Exhibit 3**), ¶ 5.)  The night shift generally ran from 7:00 p.m. to 7:00 a.m. the next morning, with officers typically arriving for roll call at about 6:45 p.m.  *Id.*, ¶ 5.  On June 13, 2016, Hurst was driving to work in his marked MPD patrol car wearing his full police uniform.  *Id.*, ¶ 6.  Traveling south on Stanton Road, he saw a white Lexus ahead of him make an abrupt left turn onto Wagner Street and, in the process, cut off a gray Ford sedan going north on Stanton Road, almost causing a collision.  *Id.*, ¶ 7.  He activated his patrol car's blue lights, waited for the Ford sedan to pass him and then turned onto Wagner Street where he saw the Lexus, which had already slowed down, pull into the driveway of a doctor's office on the south side of the street.  (Ex. 3, ¶ 7; Ex. 1, Blackmon Dep. at 47, ll. 11-16; Ex. 2, Amos Dep., p. 115, l. 7 to p. 116, l. 2; Exhibit 107 to Amos Dep.)  The Lexus came to a halt with its front-end in the driveway and its rear protruding into Wagner Street.  (Ex. 3, ¶ 7; Ex. 2, Amos Dep., p. 115, l. 23 to p. 116, l. 2; Exhibit 107 to Amos Dep.)

Officer Hurst pulled up behind the Lexus and checked the time.  (Ex. 3, ¶ 7.)  It was 6:16 p.m.  He got out of his patrol car and walked up to the Lexus.  *Id.*, ¶ 7.  He approached the passenger side of the Lexus because, given the way the vehicle was positioned, it was closer to him than the driver's side and approaching the driver's side would have required him to walk out into the street to go around the rear of the vehicle.  *Id.*, ¶ 7; Ex. 1, Blackmon Dep., p. 47, l. 20; p. 112, l. 20 to p. 113, l. 12; Ex. 2, Amos Dep., p. 95, l. 12-16.

Officer Hurst saw that the driver of the Lexus was a young black male.  (Ex. 3, ¶ 8.)  Hurst did not know the driver, and the driver never provided his name, but Hurst later came to learn it was Michael Moore.  *Id.*, ¶ 8.  Another young black man with whom Hurst was not

familiar occupied the front passenger seat. *Id.* This was Amos. Blackmon was in the back seat, but Hurst did not notice him at that time.

The Lexus had a sunroof, which was open, allowing Officer Hurst to see, and speak with, Moore. *Id.* Hurst commented to Moore about his having almost caused an accident, and Moore responded that his brakes were bad. *Id.*, ¶ 8; Ex. 1, Blackmon Dep., p. 33, l. 19 to p. 34, l. 1; p. 114, ll. 2-5; Ex. 2, Amos Dep., p. 96, ll. 10-16; p. 144, ll. 18-23; p. 146, l. 23 to p. 147, l. 2. Officer Hurst told Moore he should not be driving a car with bad brakes and asked for his driver's license. (Ex. 3, ¶ 8; Ex. 1, Blackmon Dep., p. 33, l. 19 to p. 34, l. 2; p. 113, ll. 15-20; Ex. 2, Amos Dep., p. 31, ll. 17-20; p. 145, l. 16-18.) Moore pulled some papers from the glove compartment and told Hurst he had his insurance card. (Ex. 3, ¶ 8.) Officer Hurst asked again for Moore's driver's license and Moore said he did not have it with him, but he provided a license number verbally.[1] *Id.*, ¶ 8; Ex. 1, Blackmon Dep., p. 113, l. 18 to p. 114, l. 1; Ex. 2, Amos Dep., p. 145, ll. 16-22. Officer Hurst asked Moore to repeat the number, and Hurst wrote it in his notebook. (Ex. 3, ¶ 8; Ex. 1, Blackmon Dep., p. 113, l. 18 to p. 114, l. 1.) Hurst then told Moore to sit tight and returned to his patrol car. (Ex. 3, ¶ 8.) Once Officer Hurst left, Moore told Blackmon and Amos that the Lexus belonged to his aunt (not his girlfriend, as he had previously claimed) and that Moore's mother had reported the vehicle stolen. (Ex. 1, Blackmon Dep., p. 114, line 18 to p. 115, l. 15; Ex. 2, Amos Dep., p. 114, l. 10 to p. 115, l. 1.)

When Officer Hurst got back in his patrol car, he called the police dispatcher to provide the location of the traffic stop and the Lexus's tag number. (Ex. 3, ¶ 9.) Shortly after that, Officer Hurst heard the dispatcher put out a radio request for an officer to back Hurst because there was a possible Code 29 on the Lexus, meaning the vehicle was possibly stolen, or the

---

[1]     In fact, Moore was in possession of his driver's license at the time. (Affidavit of Sgt. Armand Campbell ("Campbell Aff.") **(Exhibit 4)**, ¶ 5 & Exhibit B thereto.)

subject of a warrant or some other irregularity.  *Id.*, ¶ 9.  Hearing this, Hurst decided to run the Lexus tag number on the computer in his patrol car.  *Id.*  He first accessed the National Crime Information Center ("NCIC") which revealed that MPD Officer Demetrius Watts had filed a stolen-vehicle report for the Lexus.  (*Id.*; Affidavit of Demetrius Watts (**Exhibit 5**), p. 2 and Ex. A thereto.)  Next, Hurst ran the Lexus tag number in the Law Enforcement Tactical System ("LETS"), which displayed a photograph of the vehicle's owner, who was an older white man. (Ex. 3, ¶ 9.)  Finally, Hurst typed the driver's license number that Moore had given him into LETS and this brought up a photograph of the holder of that license – once again, it was a white male, but one different from the owner of the Lexus.  (Ex. 3, ¶ 9.)

The dispatcher was having difficulty securing backing for Officer Hurst.  (Ex. 3, ¶ 10.)  It was shift-change, a time of day when officers are not readily available to provide backing because those going off duty are preoccupied with completing assignments and mandatory paperwork, and officers on the upcoming shift have not yet arrived.  *Id.*, ¶ 10.  At that time of the evening, when many people have left work and are driving home or to other locations, there is also a spike in the number of calls for police assistance with traffic incidents, domestic disputes and other matters, reducing their availability to provide back-up.  *Id.*

Eventually, Officer Terry Clark responded on the radio that he could back Hurst, but Clark was at Airport Boulevard near Interstate 65 (I-65), which was a long way off and in one of the most heavily-trafficked areas of the City.  Ex. 3, ¶ 11.  Making matters worse in terms of back-up response time, it was rush hour.  *Id.*

While Officer Hurst waited in his patrol car for backup to arrive, he monitored the white Lexus.  *Id.*, ¶ 12.  He now noticed for the first time that there was a third occupant in the vehicle. *Id.*  Another young black male who Hurst did not recognize was in the back seat and was staring

at Hurst through the rear window while speaking with the others in the Lexus.  *Id.*  At the same time, Hurst noticed that the driver was moving around furtively in his seat.  *Id.*  In Hurst's experience as a patrol officer who had conducted many traffic stops, the actions of the driver and backseat passenger were very unusual for occupants of a vehicle that had been pulled over by law enforcement.  *Id.*

Weighing all the circumstances, Officer Hurst decided he needed to take steps to secure the driver of the Lexus.  *Id.*, ¶ 13.  The car was reported stolen.  *Id.*  The driver had given him a false license number.  *Id.*  The driver and the rear seat passenger were acting suspiciously.  *Id.*  No backup had arrived, and Hurst knew that it would be some time before any other officer showed up to assist him.  *Id.*

Officer Hurst got out of his patrol car and drew his service weapon, holding it in his right hand, close to his chest and pointed at the ground, in what is known as the low-ready, or Sul, position.  *Id.*, ¶ 14.  This time, he approached the driver's side of the Lexus.  *Id.*, ¶ 14; Ex. 1, Blackmon Dep., p. 115, l. 23 to p. 116, l. 2; Ex. 2, Amos Dep., p. 98, l. 1-4.  Officer Hurst instructed Moore and both passengers to put their hands where he could see them, and they complied.  (Ex. 3, ¶ 14; Ex. 2, Amos Dep., p. 35, l. 20 to p. 36, l. 6; p. 148, l. 4-12.)  Hurst then directed Moore to step out of the vehicle, which he did.  (Ex. 3, ¶ 14; Ex. 2, Amos Dep., p. 33, ll. 4-7; p. 149, ll. 11-17).

Once out of the Lexus, Moore turned and faced the vehicle, his hands extended above the roof, with Hurst standing a few feet behind him, his gun still drawn.  (Ex. 3, ¶ 14; Ex. 1, Blackmon Dep., p. 119, ll. 7-14; p. 112, ll. 11-19; Ex. 120 thereto at COM 2734; p. 185, ll. 11 to p 186, l. 2; Ex. 2, Amos Dep., p. 152, l. 15 to p. 153, l. 1; p. 153, ll. 10-17).  Moore was wearing a t-shirt and shorts, and held a white cell phone in his right hand.  (Ex. 3, ¶ 14; Ex. 1, Blackmon

Dep., p. 118, l. 2 to p. 119, l. 6; Exhibits 121 & 122 to Blackmon Dep.)  Officer Hurst's intention at that point was to handcuff Moore and conduct a "Terry pat" for safety purposes, and then to arrest him for providing a false driver's license number and confirm through dispatch that the Lexus was stolen to determine whether Moore would also be charged with possession of stolen property.  *Id.*, ¶ 14.

While Moore was standing with his hands extended over the roof of the Lexus, Officer Hurst instructed him to put down his cellphone.  *Id.*, ¶ 15.  Hurst expected that Moore would simply place the phone on the roof of the car.  *Id.*  Instead, Moore turned to his left and bent, or crouched, slightly as if he was placing the cellphone on the ground next to the vehicle.  *Id.*  As he did so, his T-shirt rode up and Officer Hurst noticed that Moore had a pistol tucked into the right waistband of his shorts.  *Id.*  Hurst could see the pistol's black grip, which held a magazine.  *Id.* Because Hurst's attention was diverted to the gun at that point, he did not actually see whether Moore placed his cellphone on the ground, although he assumed at the time that Moore had done so.  *Id.*

Officer Hurst was alarmed to see that Moore had gotten out of the Lexus armed with a gun.  *Id.*, ¶ 16.  Moore had had plenty of time to remove the gun from his person before Officer Hurst approached the Lexus for the second time and told him to get out, but Moore had not done so.  *Id.*  And Moore had not told Officer Hurst that he was armed.[2]  *Id.*

---

[2]     On the night of the incident, Blackmon told MPD detectives that when Officer Hurst went back to his patrol car, Moore reached under his seat and then put the gun on his waist.  (Blackmon Dep., p. 167, ll. 13-19). Blackmon agrees it is possible Moore had the gun on his hip during some of the time they were riding around that day and, at other points, may have stowed the gun under, or to the side, of his car seat.  (Blackmon Dep., p. 168, l. 18 to p. 169, l. 1).  In any event, as shown below, Officer Hurst, Blackmon and Amos all agree that Moore had the gun on his waist when he stepped out of the vehicle.  This is also confirmed by Ronald Walker, a motorist who saw Moore's gun as he drove past the traffic stop in the moments after Moore exited the Lexus.  (Affidavit of Ronald Walker ("Walker Aff.") (**Exhibit 6**), ¶¶ 2-9.)

As soon as Officer Hurst noticed the gun on Moore, he told Moore that he saw it and directed him not to reach for it.  *Id.*, ¶ 17.  Blackmon and Amos both heard Hurst tell Moore, "I see a gun" or "I see the gun on your hip." (Ex. 1, Blackmon Dep., p. 117, ll. 8-20; p. 34, ll. 6-9; Ex. 2, Amos Dep., p. 36, ll. 19-21).  Once Officer Hurst said this, Blackmon and Amos looked and saw that Moore indeed had a gun on him.  (Ex. 1, Blackmon Dep., p. 134, ll. 9-13; Ex. 2, Amos Dep., p. 40, ll. 11-15; p. 99, l. 18 to p. 100, l. 5; p. 155, l. 14 to p. 156, l. 13).  The gun they saw was black with silver on top and was on Moore's right hip.  (Ex. 1, Blackmon Dep., p. 70, l. 11-17; p. 71, l. 18-21; Ex. 2, Amos Dep., p. 99, l. 18 to p. 100, l. 5; p. 103, l. 7-15; p. 156, ll. 1-17).  Ronald Walker, a motorist who was driving west on Wagner Street, also saw Moore's gun.  (Ex. 6, Walker Aff., ¶¶ 2-9.)  While Walker was slowing down to stop at the intersection with Stanton Road, he passed by Moore (who was then standing at the side of the Lexus, facing the car, with Officer Hurst behind him) and saw a pistol with a black grip "stuck in [Moore's] waistband."  (Walker Aff, ¶ 4-5.)[3]

Upon seeing the pistol tucked into Moore's waistband, Officer Hurst's immediate thought was to retrieve and secure the gun, and then to handcuff Moore and arrest him.   (Ex. 3, ¶ 17.)  But Hurst never got a chance to do any of that.  *Id.*  After bending to put his phone on the ground, Moore straightened back up, still facing the Lexus, with his back to Hurst.  *Id.*  Moore paused for a second, then suddenly broke away from Hurst.  *Id.*  Blackmon testified that Officer Hurst "had Mike by the back of the shirt and they were spinning around, but the police officer had the gun to Mike's side like this, telling him I'm gonna shoot you, stop moving or I'm gonna shoot you."  (Ex. 1, Blackmon Dep. at p. 122, ll. 2-6.)  Moore stepped around the open driver's door of the Lexus and moved about six feet from Hurst, to the front of the car, where he spun

---

[3]    Moore's pistol was recovered by trauma room personnel at the University of South Alabama Medical Center, where he was taken by paramedics of the Mobile Fire and Rescue Department who arrived on the scene shortly after the shooting.  (Campbell Aff., ¶ 4 and Exhibit A thereto.)

around rapidly to face Hurst with his hands at chest level.  (Ex. 3, ¶ 17; Ex. 1, Blackmon Dep., p.

120, ll. 19-22; p. 122, ll. 12-15; p. 123, lines 2-8; p. 186, ll. 6-12; Ex. 2, Amos Dep., p. 47, ll. 16-

23; p. 107, ll. 7-11).[4]  Blackmon says he lost sight of Moore's right hand for a second when

Moore broke away from Officer Hurst and spun around to face Hurst.  (Ex. 1, Blackmon Dep., p.

136, l. 18 to p. 137, l. 3.)  Blackmon then heard Officer Hurst yelling at Moore to get on the

ground.  *Id.*, p. 124, lines 2-7.  Moore's eyes locked on Officer Hurst intensely and Hurst saw

Moore's right hand move toward where Hurst had just seen the gun on Moore's waist.  (Ex. 3, ¶

17.)  In that split-second, Officer Hurst believed that Moore intended to access his gun to use it

against him, so he fired a rapid burst of four shots.  *Id.*[5]  Blackmon testified that the incident

happened quickly, and that Moore's hands were coming up at the same time that Officer Hurst

started shooting.  (Ex. 1, Blackmon Dep., p. 110 lines 13-19; p. 125, ll. 6-12; p. 136, l. 18 to p,

137, l. 3.)

     After Hurst fired his gun, Moore stumbled backwards and fell on his back in front of the

Lexus, with his head raised and his eyes still on Officer Hurst.  (Ex. 3., ¶ 17.)  Hurst shouted at

Moore to put his hands behind his head, but Moore did not comply.  *Id.*  Instead, Moore looked

away from Hurst, toward the right side of his waist, and again moved his right hand toward

where Hurst had seen the gun tucked into his shorts.  *Id.*  At that point, believing that his life was

---

[4]    Amos knows only that Moore moved at some point from his position facing the Lexus with his hands on the roof and Officer Hurst behind him, to a position closer to the front of the car, with Moore and Hurst facing one another.  (Ex. 2, Amos Depo., p. 112, ll. 10-19).  Amos does not recall seeing Moore move, as he was obeying Officer Hurst's direction to keep his hands where Hurst could see them and was staring straight ahead.  *Id.*, p. 154, ll. 2-15.  In short, Amos does not know how Moore got from one point to another.  *Id.*, p. 158, ll. 11-21.  Similarly, Amos did not see whether Moore made a move to get on the ground because he was not looking.  *Id.*, p. 159, l. 21 to p. 160, l. 2.  Amos also does not recall where Moore's hands were.  *Id.*, p. 90, l. 13 to p. 91, l. 1.  Amos, facing straight ahead, had shut his eyes when the shooting started and opened them only after the shooting ended.  *Id.*, p. 41, ll. 7-15; p. 43, l. 21 to p. 44, ll. 3; p. 106, l. 6 to p. 107, l. 11.

[5]    Blackmon and Amos testified that the last words Officer Hurst uttered before firing were, "Get on the ground!  Get on the ground!"  (Blackmon Dep., p. 161, ll. 9-15; p. 186, ll. 15-19; Amos Dep., p. 42, ll. 2-9; Amos Dep., p. 106, ll. 6-10).  Terry George, who lives across the street from where the incident occurred and was on his front porch at the time, recalls that right before shots were fired, Officer Hurst shouted something like, "Don't move! Don't move!" or  "Get down! Get down!"  (Declaration of Terry George, Sr. (**Exhibit 7**), ¶ 6.)

still in danger, Officer Hurst fired one more shot. *Id.* The entire sequence of events from when Moore broke away from Hurst until the last shot was fired went by in a flash, taking no more than a few seconds. *Id.*; *see also* Blackmon Dep., p. 110, ll. 13-19; Amos Dep., p. 93, l. 20-21.[6]

Just before the shooting began, Dr. Jacek Polski, a pathologist and medical school associate professor, had stopped his car right behind Officer Hurst's patrol car and the Lexus. (Deposition of Dr. Jacek Polski (and Exhibit 127 thereto) ("Polski Dep.") (**Exhibit 10**) at p. 9, ll. 12-13; p. 13, ll. 10-21) From his vehicle, Dr. Polski saw Officer Hurst and Moore. *Id.* at p. 13, l. 23 to p. 14, l. 6.) By then, Moore had moved towards the front of the Lexus. *Id.* at p. 60, ll. 2 to p. 61, l. 7; p. 64, l. 17 to p. 66, l. 7; & Exhibit 127 to Polski Dep. Moore and Hurst were facing each other and were "animated." *Id.* at p. 13, l. 23 to p. 14, l. 2; p. 19, l. 9; p. 61, ll. 11, 14. Their "body language indicated there was some kind of tension, anxiety, maybe fear" on the part of both Officer Hurst and Moore. *Id.* at p. 19, ll. 8-9, 18; p. 55, ll. 14-16, 21-23, p. 58, l. 3. Dr. Polski could see only Moore's left profile, and could not see Moore's right side (including the right side of his waistband) or either of Moore's hands, but Polski is sure that neither of Moore's hands was up. *Id.* at p. 61, ll. 1, 3 and Ex. 127 thereto; p. 63, l. 7-9; p. 64, ll. 3, 13, 16; p. 69, ll. 3, 5, 8. Because Dr. Polski could not see Moore's hands before the shooting began, he does not know what Moore was doing with his hands at the time. *Id.* at 67, ll. 8, 11. Dr. Polski is also sure that Moore was facing Officer Hurst when the shooting began, and never turned away from Hurst. *Id.* at p. 66, l. 23; p. 67, ln. 2.

Suddenly, Dr. Polski heard a single, rapid burst of 3-5 gunshots. *Id.* at p. 63, ll. 12, 16, 19. Moore fell on his back and his hands continued to move after he was on the ground. *Id.* at 70, l. 5. Indeed, as Dr. Polski testified at his deposition, photographs he took with his cellphone

---

[6]    Moore was hit by three of the shots, all of which hit him in the front of his body. (**Exhibit 8** (Moore Autopsy Report prepared by the Alabama Department of Forensic Sciences ("ADFS") at p. 1); **Exhibit 9** (ADFS diagram showing location of gunshot wounds #1, #2 and #3 sustained by Moore.)

about 15 seconds after the last shot was fired show that Moore's hands were still moving at that time. *Id.* at p. 30, ll. 1-6; p. 73, ll. 5-22 and Ex. 127 thereto (Dr. Polski photographs showing Moore's arm/hand movement – from the photo marked COM 00122 to the next photo taken, marked COM 00123 – as Moore lay on the ground).

Police "[o]fficers must, and do, use their discretion and judgment in carrying out all aspects of their duties."  (Affidavit of former MPD Chief of Police and current Mobile Safety Director James Barber **(Exhibit 11)**, ¶ 8.)  Under the circumstances that Officer Hurst faced at the time of the incident, he "acted in accordance with [the MPD] policy on the use of deadly force." *Id.,* ¶ 15.  Hurst was authorized to, and did, exercise his discretion to use deadly force to address the threat he faced until that threat was eliminated.  *Id.*, ¶ 16; Affidavit of former FBI Special Agent Kelvin King (**Exhibit 12**), ¶¶15-16.)

After Officer Hurst fired the final shot, Moore appeared to lose consciousness and, seeing this, Hurst believed he could for the moment turn his attention primarily to the two passengers in the Lexus who he feared might also be armed.  (Ex. 3, ¶ 18.)  He trained his service weapon on the passengers and, in a loud voice, he commanded them again to put their hands where he could see them.  (Ex. 3, ¶ 18; Ex. 1, Blackmon Dep., p. 141, l. 4-12; Ex. 2, Amos Dep., p. 161, l. 6-21; Ex. 10, Polski Dep. at 30, ll. 12-13.)  Officer Hurst then called police dispatch and repeated his request for backup.  (Ex. 3, ¶ 18.)

Minutes later, MPD Officer Ophelia Weathington arrived on the scene, jumped from her car and sprinted to the passenger side of the Lexus, her service weapon drawn.  *Id.,* ¶ 19.  Officer Hurst asked her to take over holding the two passengers at gunpoint, which she did, thereby allowing him to safely redirect his attention to Moore, who lay motionless on his back on the ground.  *Id.*  Hurst bent down, rolled Moore onto his stomach and handcuffed his hands behind

his back.  *Id.*  Hurst then moved immediately to secure the two passengers in the Lexus.  *Id.*
Together with Officer Weathington and Officer Deandre Portis, who had just arrived on the
scene, Hurst helped remove the passengers from the Lexus and handcuff them.  *Id.*  The  two
passengers were then placed in separate patrol cars.  *Id.*[7]

While Officers Hurst, Weathington and Portis were securing the two passengers,
numerous other Mobile police officers began arriving on the scene, including Hurst's sergeant,
Sherrod Phillips.  *Id.*, ¶ 20.  Hurst spoke briefly with Sergeant Phillips and advised him that he
had not searched Michael Moore.  *Id.*  By then a hostile crowd was gathering and angry shouts
were being directed at Officer Hurst, so Sgt. Phillips instructed Hurst to get in Phillips' patrol car
and drove Hurst away from the scene to the Third Precinct station house.  *Id.*[8]

## LEGAL ARGUMENT

### Legal Standard for Summary Judgment

Summary judgment is appropriate when the moving party shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(a).  In evaluating the argument of the moving party, the Court must view all evidence
in the light most favorable to the non-moving party and resolve all reasonable doubts about the
facts in its favor.  *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999).  "The non-
moving party 'may not rest on the mere allegations or denials of the [non-moving] party's

---

[7]     Video recorded by Officer Weathington's body camera captures much of the events described in this
paragraph.  (Weathington Video (**Exhibit 13**) at minute mark 1:56 – 4:00.)

[8]     During discovery, plaintiff produced declarations procured from certain purported witnesses.  It is not
known whether plaintiff intends to rely on these alleged declarations, but if she does, defendants will move to strike
them on several grounds.  First, the declarations are not accurate or reliable.  Some of the supposed declarants
testified at their depositions that they had never even seen their alleged declarations (until being shown copies at
their depositions), but rather had only been given signature pages to sign without understanding what it was they
were signing.  Others testified that their alleged declarations are incorrect on material points.  Moreover, video
recordings taken by police officer body cameras at the scene in the immediate aftermath of the shooting incident
flatly contradict the central allegations in some of the purported declarations.  Finally, some of the supposed
declarants, one of whom is believed to reside in Louisiana, evaded service of subpoenas and notices for their
depositions and it is unlikely that their attendance could be secured for any trial in this matter.

pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.' " *Mallini v. Ala. Dep't of Indust. Rels.*, No. 10-0130-CG-C, 2011 WL 1897646, at \*3 (S.D. Ala. May 18, 2011) (quoting Fed. R. Civ. P. 56(e)).  "The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment."  *Beard v. Langham*, 649 F.Supp.2d 1332, 1336 (S.D. Ala. 2009).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

## I.      OFFICER HURST IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S SECTION 1983 CLAIMS FOR EXCESSIVE FORCE

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified Immunity is an immunity from suit rather than a mere defense from liability."  *McClish v. Nugent,* 483 F.3d 1231, 1237 (11th Cir. 2007). "The purpose of qualified immunity is to ensure that officials are not deterred or distracted from carrying out their official duties because of fear of a later lawsuit." *Robinson v. Arrugueta,* 415 F.3d 1252, 1257 n.5 (11th Cir. 2005).

The qualified immunity analysis involves the following three steps: (1) The alleged conduct must fall within the scope of the discretionary authority of the actor; (2) if it does, the

Court must then determine whether that conduct violates a constitutional right; and (3) if so, the Court must inquire whether the asserted right was clearly established at the time of the alleged violation. *Tinker v. Beasley,* 429 F.3d 1324, 1326 (11th Cir. 2005).

To determine whether an official is engaged in a discretionary function, the Court considers whether the acts undertaken by the official are of a type that fall within the employee's job responsibilities. *Crosby v. Monroe County,* 394 F.3d 1328, 1332 (11th Cir. 2004).   The Court asks whether he was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize. *Holloman ex rel Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004). "In considering whether an act of allegedly excessive force fell within a police officer's duties, for example, we do not ask whether police have the right to use excessive force. We also do not immediately jump to a high level of generality and ask whether police are responsible for enforcing the law or promoting the public interest.  We instead ask whether they have the power to attempt to effectuate arrests."  *Id.* at 1266.  The actions of Officer Hurst in pulling Michael Moore over for a traffic stop, and his subsequent interactions with Mr. Moore, are the types of activity or job functions of a law enforcement officer that fall within his discretionary authority.

"Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Lewis v. City of West Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009).  "[T]he burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood that his acts were unlawful."  *Post v. City of Lauderdale,* 7 F. 3d 1552, 1557 (11th Cir. 1993).  Although a case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011).  "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can ' "reasonably . . . anticipate when their conduct may give rise to liability for damages." ' "  *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

"[T]he right allegedly violated must be established, ' " not as a broad general proposition," ' . . . but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official."  *Reichle,* 566 U.S. at 665 (quoting *Anderson*, 483 U.S. at 640) (internal citation omitted).  The dispositive question is "whether the violative nature of **particular** conduct is clearly established."  *Ashcroft,* 563 U.S. at 742 (emphasis added).  The inquiry must be undertaken in light of the "specific context of the case, not as a broad general proposition."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'"  *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft*, 531 U.S. at 743).  Such specificity is "especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'"  *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (quoting *Saucier*, 533 U.S. at 205).

In the Eleventh Circuit, "the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court,  Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."  *Jenkins by Hall v. Talladega City Brd. of Ed.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997),  *cert. denied,* 522 U.S. 966 (1997); *accord Hudson v.*

*City of Atlanta, Ga.,* 2017 WL 1352086, *3 (11th Cir. April 3, 2017).

As discussed above, the first step in the qualified immunity analysis is determining whether the plaintiff's constitutional rights have been violated. A claim that law enforcement officers have used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . ." *Id.* at 398. Three non-exclusive factors that can serve as a guide in measuring the constitutionality of an officer's use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer[] or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Varnadore v. Merritt*, ___ Fed. Appx. ___, 2019 WL 3429136, *4 (11th Cir., July 30, 2019) (quoting *Graham,* 490 U.S. at 396.)[9] "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*at 396-97.

Determining whether the force used to effect a particular seizure is "reasonable" under

---

[9] It is not necessary that all three factors weigh in an officer's favor to establish that the force used was reasonably proportionate to the need for force. *Varnadore,* 2019 WL 3429136, *4. Where a reasonable officer "could have believed under the circumstances that the [plaintiff] 'posed a threat of inflicting serious injury or death' to [the officer], then 'the shooting was objectively reasonable regardless of whether [plaintiff] had already committed a crime or was resisting or attempting to evade arrest.' " *Wilson v. Parker*, 746 Fed. Appx. 860, 863 (11th Cir. 2018) (quoting *Shaw v. City of Selma*, 884 F.3d 1093, 1099 n.5 (11th Cir. 2018)). *See also Davidson v. City of Opelika*, 675 Fed. Appx. 955, 959 (11th Cir. 2017) (although first and third factors did not support police officer's claim of qualified immunity, second factor alone provided qualified immunity where victim of shooting incident objectively posed grave and immediate threat to officer). The Eleventh Circuit has reduced this second factor to a single question: "Whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002).

the Fourth Amendment "requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  An individual's interest in his life, "while undoubtedly great, is not absolute, for society has a countervailing interest in effective law enforcement and the protection of its citizens and law enforcement officers." *Harrell v. Decatur Co., Ga.*, 22 F.3d 1570, 1580 (11th Cir. 1995) (Dubina J., dissenting*), opinion vacated on rehearing*, 41 F.3d 1494 (11th Cir. 1995) (adopting Judge Dubina's dissent).   "Policemen on the beat are exposed, in the service of society, to all the risks which the constant effort to prevent crime and apprehend criminals entails:  Because these people are literally the foot soldiers of society's defense of ordered liberty, the state has a special interest in their protection." *Id*.  (quoting *Roberts v. Louisiana*, 431 U.S. 633, 646-47 (1977) (*Rehnquist, J., dissenting*)).

"As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015).  "We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.' " *Id*.  (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005)).

If the court determines a constitutional violation has occurred, the qualified immunity analysis then requires a determination of whether the Defendant's conduct violated "clearly established law."   The Eleventh Circuit recently had occasion to review its precedents for "clearly established law" in a very similar context involving an officer's sudden confrontation with an armed suspect.  In *Young v. Borders*, 850 F.3d 1274 (11th Cir. 2017), the Court denied a

petition for rehearing en banc of a panel decision that had affirmed the district court's ruling that a deputy sheriff was entitled to qualified immunity on the plaintiff's §1983 claims arising out of the shooting of her decedent, Andrew Scott.   Concurring in the decision to deny rehearing en banc, two of the three original panel members wrote an opinion that summarized the factual background of the case and explained why the panel had correctly affirmed the district court's conclusion that the deputy was entitled to qualified immunity.   The deputy in *Young*, after chasing a motorcycle speeding at 90 miles an hour, found a still-hot motorcycle in front of apartment 114 in the Blueberry Hill Apartments.   He had been advised that the motorcyclist might be an armed suspect involved in an earlier assault and battery incident.   The deputy knocked on the door to apartment 114.   The resident inside apartment 115 next door heard the knocking, opened his door, and confirmed to the deputy that the resident was the owner of the motorcycle.   The deputy then saw apartment 114's door suddenly open and Mr. Scott standing in the doorway with a gun in his hand, a few feet from the deputy.   Scott then began moving and backing away behind the door in a sudden movement that the deputy perceived as an attempt to edge back and take cover "so he could fire on me." *Id.* at 1278.   Although the officer testified Scott pointed the gun at him, the Plaintiff, Scott's girlfriend, testified that Scott held his gun down at his side. *Id.*   In that split second, the deputy tragically shot and killed Scott, an innocent young man who was not the motorcyclist. *Id.*   Even crediting the Plaintiff's version of the events, the district court concluded that a police officer with the deputy's knowledge could have reasonably perceived in that split-second "(1) that the person who opened the 114 door with a gun in his hand was the reported armed motorcyclist (2) that the person's sudden movement — backing and edging behind the door — was an attempt to take cover to fire, and (3) that the person thus posed an imminent 'threat of serious physical harm' to [the deputy]." *Id.* at 1279.

The district court concluded that the deputy's split-second decision to use deadly force was "objectively reasonable under the total circumstances" and "was not a constitutional violation." *Id.* at 1280.   It concluded that he was "not required to wait and see what might happen if he did not stop Mr. Scott."   *Id.*   Finally, even if Mr. Scott's constitutional rights had been violated by the use of excessive force, the court concluded that the deputy was entitled to qualified immunity because he violated no "clearly established right."   *Id.* (quoting *Young v. Borders*, 2014 WL 11444072, *18 (M.D. Fla. September 18, 2014).

The Eleventh Circuit panel found "no reversible error in the district court's ultimate qualified immunity rulings."   *Id.* (quoting *Young v. Borders*, 620 Fed. Appx. 889, 890 (11th Cir. 2015)).   In their concurring opinion on the denial of an en banc hearing, the two panel judges noted that "the panel was required to find 'no reversible error' because there is no prior case with facts remotely similar, much less particularized facts similar, to the facts in this case."   *Id*. at 1282.   "More importantly, even the contours of the law in this type of unusual fact situation were not sufficiently clear such that a reasonable officer, in defendant Sylvester's situation, would understand that what he is doing violates clearly established federal law."   *Id.*

Thus, a majority of the entire Eleventh Circuit bench has concluded that a deputy was appropriately clothed with qualified immunity in making a split-second decision to fire upon an armed man who, without raising his gun, made a sudden move in an apparent attempt to take cover to fire at the officer.   Given the lack of any Eleventh Circuit precedent for finding that such conduct violates "clearly established law," it stands to reason that Officer Hurst must similarly be entitled to qualified immunity in the more threatening circumstances he suddenly faced on the evening of his encounter with Michael Moore.   In the process of stopping Moore, who had nearly caused a collision, Officer Hurst learned that Moore was driving a vehicle which had been

reported stolen and had learned that Moore had just given him a false driver's license number. After noticing the driver and a passenger acting suspiciously in the vehicle, and no backup having arrived, Officer Hurst determined he needed to take steps to secure the driver of the Lexus. With his gun drawn, he had Moore step out of the vehicle and turn and face the vehicle with his hands extended over the roof, himself standing a few feet behind Moore. With the intention of arresting Moore, he instructed Moore to put down the cell phone that he held in his right hand. As Moore leaned over to do so, Hurst noticed with alarm that Moore had a pistol tucked into the waistband of his shorts, a weapon Moore had intentionally armed himself with before he exited the vehicle and, from Officer Hurst's viewpoint, a weapon he certainly had had time to remove before being asked to get out of his vehicle. Hurst told Moore he saw the gun and directed him not to reach for it. The passengers in the vehicle both confirmed that Moore indeed had a gun and that Officer Hurst had told Moore that he saw the gun. Blackmon testified that Officer Hurst had his gun to Moore's side and was telling him not to move or he was going to shoot. Disregarding this command, Mr. Moore suddenly broke away, stepped around the open driver's door to the front of the vehicle, and spun around rapidly to face Hurst with his hands at chest level. Hurst saw Moore's right hand move toward where Hurst had just seen the gun on Moore's waist. In that split second, believing that Moore intended to access the gun to use it against him, he fired a rapid burst of four shots which brought Moore down onto his back in front of the vehicle. Moore then failed to comply with Hurst's command to put his hands behind his head, looked away from Hurst toward the right side of his waist, and again moved his right hand toward where Hurst had seen the gun tucked into his shorts. At that point, believing his life was still in danger, Officer Hurst fired one more shot. All of this took no more than a few seconds.

Review of other decisions of the Eleventh Circuit demonstrates not only that Officer Hurst violated no "clearly established law" but also that he in fact acted well within constitutional limits in using deadly force against Mr. Moore under the totality of the circumstances. In *Santana v. Miami-Dade Cty.*, 688 Fed. Appx. 763 (11th Cir. 2017), prior to executing a search warrant on a residence, a police officer was advised that the person inside the residence was a suspected drug dealer, known to be armed with a gun. *Id.* at 771. He then encountered the suspect running through the residence with a gun in his hand and ordered him to drop the gun. The suspect refused to comply and ran past the officer. *Id.* When the officer regained sight of the suspect, he was in a crouching position still holding the gun and pointing it in the officer's direction. Fearing for his life, the officer shot the suspect. *Id.* A witness testified that, after the officer gave an additional command to drop the gun, the suspect said "okay, okay, okay" and his "hand went up," and then the gun "slid" or "fell" from his hands and the suspect then "hit the floor," having been shot. *Id.* Drawing the most positive inference from this testimony — that the suspect was not still holding the gun at the precise moment when he was shot — the court stated that the shooting necessarily occurred within a split second of the gun leaving his hands. *Id.* The court recognized that this testimony suggested that the suspect "might have intended to begin the process of surrendering immediately prior to being shot." *Id.* However, the court could not infer from the testimony that "every reasonable officer would have intuited from [the suspect's] ambiguous act — occurring at most just a split-second before [the officer] fired — that [the suspect] no longer posed a serious threat at the time of the shooting." *Id.* He had ignored at least one command to drop the gun and had never gotten down voluntarily on his knees before the shots were fired. The officer could have reasonably interpreted the statement "okay, okay, okay" and the movement of his hands "up" as "an escalating threat rather

than as an attempt to surrender, particularly given that the gun had not 'slid' or '[fallen]' from Santana's hand until the same time as, or possibly even after, his hands began moving up." *Id*. at 772.  The court was not persuaded that "every reasonable officer" would have concluded the deadly force was unnecessary and thus unlawful under those circumstances. *Id.* at 772.  Thus, there was no constitutional violation. *Id.* at 771-772.  Even assuming there were, the court found the officer entitled to qualified immunity due to the absence of any case law that would have put the officer on notice that his conduct violated "clearly established" law.  *Id*. at 772-773.

In *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), a man suspected of violent crimes attempted to elude a police officer chasing him, then suddenly confronted the officer, armed with a gun, and standing 8 to 10 feet away.  The officer fired his pistol repeatedly without warning, severely injuring the suspect.  The officer testified that the suspect was pointing his gun at him.  The suspect denied that he pointed his gun at or indicated he would shoot the officer.  *Id*. at 819.  He claimed that he fell to the ground after being struck by the first or second bullet after which the officer continued "maliciously and sadistically" to shoot him.  *Id*.  Reversing the district court's denial of the officer's summary judgment, the Eleventh Circuit concluded that the officer "reasonably perceived the situation as an ambush that required the use of deadly force." *Id*. at 821.  Regardless of whether the suspect had drawn his gun, the gun "was available for ready use, and [the officer] was not required to wait 'and hope [] for the best.' " *Id*. (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)).  The court also held the officer was entitled to qualified immunity for the volley of shots that continued after the first or second shot that the suspect claimed had brought him down.  The court noted that a police officer is entitled to continue to use force until a suspect thought to be armed is "fully secured." *Id*.  (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009)); *see also Davis v. Edwards*, ___ Fed.

Appx. _____, 2019 WL 3814435 (11th Cir. August 14, 2019) (officer entitled to qualified immunity for fatally shooting mentally retarded adult, known to have violent propensities and believed to be armed, who refused to follow commands to keep his hands up and instead moved his hands toward his back waistband; even assuming that deputy did not see suspect's gun before he fired his weapon, deputy was in precarious position necessitating immediate decision and "was not required to wait any longer before using deadly force"); *Long v. Slaton,* 508 F.3d 576, 581 (11th Cir. 2007) ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect.").

The Eleventh Circuit has found no constitutional rights violated even where the officer uses deadly force on an unarmed suspect he mistakenly believed was armed and dangerous.  In *Davidson v. City of Opelika*, 675 Fed. Appx. 955 (11th Cir. 2017), a police officer was dispatched to the scene of an erratic driver on the interstate.  Just before the officer caught up with the driver, the driver's vehicle collided with an 18-wheel truck.  The officer parked behind the driver's vehicle and exited his cruiser with his gun drawn.  As the driver pushed his way out of the vehicle, he withdrew his wallet from his pocket. The officer yelled "let me see your hands" twice.  Simultaneously, the driver brought his hands together and then extended them outward toward the officer.  The wallet was visible over the top of the driver's clasped hands. The officer fired two shots in rapid succession as he finished his second command to Davidson. Although the officer could not have reasonably suspected that the driver was guilty of any violent crime or that he was attempting to resist arrest, the unusual position of the dark object in the driver's outstretched and clasped hands "would have led a reasonable officer to believe that [the driver] was pointing a gun at him." *Id.* at 958.  Affirming summary judgment for the officer, the court concurred with the district court's conclusion that the driver objectively posed a "grave

and immediate threat" to the officer and that the plaintiff had failed to establish that the officer violated his constitutional rights.  *Id*. at 959.  The court did not need to reach the issue of whether the rights were clearly established for purposes of a qualified immunity defense.  *Id; see also Varnadore v. Merritt*, _____ Fed. Appx. _____, 2019 WL 3429136 (11 Cir. July 30, 2019) (officer entitled to qualified immunity for fatal shooting of man who,  following a high speed chase, failed to obey command to show his hands, leaned into truck, then jumped from truck, facing officer and moving right hand quickly from his left side near belt line and towards deputy, holding what was later found to be a CD case and paper); *Bodden v. Bodden*, 510 Fed. Appx. 850, 852 (11th Cir. 2013) (in "tense, uncertain and rapidly evolving" situation confronting officer, who shot and killed a man who turned towards officer with bag of marijuana in his hand, instead of dropping it and showing hands as commanded, and where deputy thought object was a pistol, use of deadly force was "objectively reasonable"; court "decline[d] to second guess his split-second judgment")

These precedents show that an officer's use of deadly force falls within the parameters of qualified immunity in circumstances where the officer could reasonably believe he was in imminent danger of serious bodily injury, whether the suspect actually has a weapon, or whether a weapon has actually been drawn.  The facts in the present case fall well within the constitutional parameters of a reasonable use of force.  Even if Officer Hurst's conduct violated Moore's constitutional rights, which it did not, Plaintiff can point to no clearly established law in the United States Supreme Court or in this Circuit that would have given Officer Hurst fair notice that his conduct was unlawful.  Officer Hurst is entitled to summary judgment on the basis of qualified immunity.

## II.   OFFICER HURST HAS LAW ENFORCEMENT IMMUNITY ON PLAINTIFF'S STATE LAW CLAIMS FOR WRONGFUL DEATH.

In addition to the §1983 claims, Plaintiff asserts a state law wrongful death claim against Officer Hurst.  (Her separate claim for negligence is simply a restatement of her wrongful death claim.) Any such claim is barred based on the law enforcement immunity applicable to Officer Hurst under state law.

Alabama Code §6-5-338 (1975) gives to police officers immunity from tort liability "arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

In *Hollis v. City of Brighton,* 950 So. 2d 300, 309 (Ala. 2006), the Supreme Court specifically modified the test for state-agent immunity, as articulated in *Ex parte Cranman,* 792 So. 2d 392, 405 (Ala. 2000), to conform to the immunity afforded by §6-5-338.  Category (4) of the *Cranman* test now reads as follows:

> A State-agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
> (4) Exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law enforcement officers arresting or attempting to arrest persons, or serving as peace officers under circumstances entitling such officers to immunity pursuant to § 6-5-338(a), Ala. Code 1975.

*Hollis,* 950 So. 2d at 309.

The Supreme Court has established a burden-shifting process when a party raises a defense of State-agent immunity. *Ex parte Kennedy,* 992 So. 2d 1276 (Ala. 2008). A state agent or law enforcement officer asserting State-agent immunity "bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity." *Ex*

*parte Estate of Reynolds,* 946 So. 2d 450, 452 (Ala. 2006).  Once the State agent makes such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity is applicable. *Id.*

There should be no dispute that Officer Hurst was engaged in law enforcement functions fitting within category (4) of the *Cranman* analysis.  See *Ex parte Kennedy*, 992 So.2d 1276 (Ala. 2008) (applying *Cranman* immunity to police officers engaged in shooting incident while effecting arrest) (Barber Affidavit).  Thus, the burden shifts to the Plaintiff to establish that there is some exception to this immunity.  To do so, Plaintiff must show that Officer Hurst acted "willfully, maliciously, fraudulently, in bad faith or beyond his or her authority."  *Cranman*, 946 So.2d 452.   A plaintiff can show that a state agent acted beyond his or her authority by providing evidence that the agent failed to discharge duties pursuant to "detailed rules or regulations, such as those stated on a checklist."  *Giambrone v. Douglas,* 874 So. 2d 1046, 1052 (Ala. 2003).

In *Ex parte Kennedy*, 992 So.2d 1276 (Ala. 2008), certain state officers had engaged in a fatal shooting of the plaintiff's decedent during an attempted arrest of him.  The Court granted a petition for writ of mandamus, holding that the officers carried their burden of showing that they were engaged in functions for which law enforcement immunity was available and that plaintiff failed to show that an exception to immunity applied.   The Court rejected the plaintiff's argument that an exception to immunity applied because the officers had violated rules and regulations set forth in the training manual.  This training manual set forth only "guidelines" and "procedures" and had not been adopted as a binding set of rules and regulations that strictly governed the officers' tactical unit. *Id*. at 1286.  Thus, the manual was not a set of "detailed rules and regulations" the violation of which would cause the State agent to lose immunity.  *Id.*

Any argument that Officer Hurst acted beyond his authority or otherwise outside of his entitlement to immunity cannot be sustained.  There is no rule, regulation, or specific checklist or instructions that would have prohibited Officer Hurst from taking the actions he did in his encounter with Moore.  There is also no evidence that Hurst acted willfully or maliciously in shooting Moore in self-defense.  The Supreme Court has held that even "poor judgment or wanton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*."  *Ex parte Randall*, 971 So.2d 652, 664 (Ala. 2007) (citing *Giambrone*, 874 So.2d at 1057).  Thus, Officer Hurst is entitled to summary judgment on Plaintiff's state law claims based on the law enforcement immunity provided to him under Alabama law.

## CONCLUSION

Based on the foregoing, Officer Hurst is entitled to summary judgment as to all federal and state law claims.

> */s/  Thomas O. Gaillard III*
> THOMAS O. GAILLARD III (GAILT9459)
> PATRICK C. FINNIGAN (FINNP3533)
> WILLIAM W. WATTS, III (WATTSW5095)
> *Attorneys for Defendant Harold Hurst*

**OF COUNSEL:**
HELMSING, LEACH, HERLONG,
   NEWMAN & ROUSE, PC
Post Office Box 2767
Mobile, AL  36652
(251) 432-5521 Telephone
(251) 432-0633 Facsimile

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this the 4th day of October, 2019, served a copy of the foregoing document by electronic mail and/or U.S. Mail, first-class postage prepaid and by email to the following:

Dallas S. Lepierre, Esquire
Nexus Derechos Humanos Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, GA 30303
(*dlepierre@ndhlawyers.com*)

Mario Williams, Esquire
Nexus Caridades Attorneys, Inc.
44 Broad Street, NW, Suite 200
Atlanta, GA 30303
(*mwilliams@ndhlawyers.com*)

Michael D. Strasavich, Esquire
BURR & FORMAN LLP
11 North Water Street, Suite 22200
Mobile, Alabama 36602
(*mstrasav@burr.com*)

*/s/ Thomas O. Gaillard, III*
OF COUNSEL

4814-4236-2535, v. 1

28